**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PETER A. NICKEL and KINEMATIC**
**TECHNOLOGIES, INC.,**

|                                          |                    |
|------------------------------------------|--------------------|
|                       **Plaintiffs,**    |                    |

     **vs.**                                           **1:13-CV-01153**
                                                          **(MAD/CFH)**

**BRENTON, LLC and PRO MACH**
**GROUP, INC.,**

                                   **Defendants.**
_____

**APPEARANCES:**                       **OF COUNSEL:**

**OFFICE OF MICHAEL T. BROCKBANK**    **MICHAEL T. BROCKBANK, ESQ.**
1494 Wendell Avenue
Schenectady, New York 12308
Attorney for Plaintiffs

**THOMPSON, HINE LAW FIRM**         **BARRY M. KAZAN, ESQ.**
335 Madison Avenue - 12th Floor
New York, New York 10017-4611
Attorney for Defendants

**THOMPSON, HINE LAW FIRM**         **ROBERT P. JOHNSON, ESQ.**
312 Walnut Street, Suite 1400
Cincinnati, OH 45202-4089
Attorney for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On May 28, 2013, Plaintiffs commenced this action in New York State Supreme Court, in

Schenectady County. *See* Dkt. No. 14-5. In the complaint, Plaintiffs asserts a claim of breach of

contract based on Defendants' failure to pay Plaintiffs a commission due on the Chobani Project.

*See id.* In the complaint, Plaintiffs seek an award in the amount of $1,050,000.00, as a proper

commission from Defendants. *See id.* On September 16, 2013, Defendants removed this action

to this Court based on complete diversity of citizenship after Defendant Jordan Company, LP was removed from the action. *See* Dkt. No. 1. Defendants' filed their answer to Plaintiffs' original complaint with the Notice of Removal. *See id.*

Currently before the Court is Defendants' motion for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Dkt. No. 14.

## II. BACKGROUND

Plaintiff Kinematic Technologies, Inc. ("Kinematic"), is a New York corporation operating in the business of "systems integrat[ion], wholesale distribut[ion], and [is an] independent agent for material handling equipment, and packaging equipment, and/or systems using that equipment." *See* Dkt. No. 14-4 at 9. Peter A. Nickel, the second party bringing this action, founded Kinematic on January 14, 1999, and has since maintained the position as the sole active co-owner and employee, with his wife acting as a silent partner. *See id.* at 10.

Defendant Brenton, LLC ("Brenton"), is a limited liability company "engaged in the business of manufacture and sale of equipment used in end of line packaging line applications," manufacturing palletizers, case packers, pallet elevators and stretch wrappers. *See* Dkt. No. 14-2 at ¶ 1. In Defendants' statement of material facts in support of the motion for summary judgment, Defendants contend that Brenton is a subsidiary of Pro Mach Inc., and that the named Defendant in the complaint, Pro Mach Group, Inc., "is neither a parent nor [a] subsidiary of Brenton." *See id.* at ¶ 2.

On January 18, 2008, Plaintiff Kinematic and Defendant Brenton entered into a written contract, titled "Channel Partner Agreement" ("Agreement"), which expressly stated that it would last for a term of one year, and would be interpreted in accordance with New York law. *See* Dkt.

No. 14-2 at ¶ 5.  The parties stipulate that under the Agreement, Kinematic was to act as a broker for Brenton on a nonexclusive basis.  *See id.*  Under the terms of the Agreement, Brenton was to pay Kinematic specified percentages of commissions earned by Brenton depending on what equipment or systems of equipment Kinematic was able to sell on behalf of Brenton.  *See* Dkt. No. 14-5 at 10.  If for example, under the terms of the Agreement, due to Kinematic's representation of Brenton, Brenton successfully sold equipment such as Currie[1] Palletizers, Currie Case Elevators or Pallet Dispensers to a customer that had been presented to Brenton by Kinematic, Brenton was obligated to pay Kinematic a commission of ten (10) percent of the total sale price Brenton earned from the sale of that equipment.  *See id.*  During the one year term of the Agreement, Kinematic successfully represented and sold Brenton products on at least four separate deals with the Beechnut Corporation.  *See* Dkt. No. 14-4 at 40.

Both parties agree that after the expiration of the one year term of the Agreement, Plaintiff Kinematic continued to represent and conduct business on behalf Brenton.  *See* Dkt. No. 15-1 at ¶ 11.  Following the expiration of the Agreement, Kinematic presented Brenton with another potential deal from the baby food manufacturer Beechnut, to whom Kinematic successfully submitted a bid for projects involving Brenton palletizers and conveyers.  *See id.*; *see also* Dkt. No. 14-2 at ¶ 11.  Although this sale was successfully completed, Brenton paid commissions to Kinematic in accordance with a commission schedule different from the commission schedule that had been set out in the January 2008 Agreement.  *See id.*

In June, 2011, Peter Nickel as owner of Kinematic, contacted Dan Johnson and Jim Horton, who were both palletizing engineers at Brenton at the time, after having received a

---

[1] Defendant Brenton purchased Currie Equipment Manufacturing Company in 2007.  *See* Dkt. No. 15-3 at ¶ 2.

request for a proposal from Agro Farm, later known as Chobani, to be submitted by August 15, 2011. *See id.* at ¶ 13. There is dispute between the parties as to what the original request from Chobani required, *i.e.*, whether Chobani was interested in only a robotic or conventional palletizing system or whether conveyors were also expected to be included in the quote. *See id.*; *see also* Dkt. No. 15-1 at ¶ 13. Before submission of the bid, Nickel and a Brenton sales manager, Rob Robinson, met with Chobani representatives in July, 2011, in order to discuss the requirements for the expansion of its upstate New York plant. *See* Dkt. No. 14-2 at ¶¶ 13, 15. Brenton submitted a preliminary firm quote[2] to Chobani, with Kinematic as its sales representative, on August 15, 2011, for "14 robotic palletizing cells and related equipment" with an estimated lead time for the completion of the project being 20-26 weeks from the day that Brenton receives a purchase order from Chobani. *See id.* at ¶ 16; *see also* Dkt. No. 14-5 at 28. There is a dispute between the parties as to whether this initial bid that was submitted by Brenton was rejected by Chobani. *See id.* at ¶ 17; *see also* Dkt. No. 15-1 at ¶ 17. Defendants contend in their motion for summary judgment that Chobani did it fact reject the original bid that Brenton and Kinematic submitted to Chobani, and that ultimately Brenton did not succeed in selling Chobani the robotic or conventional palletizers. *See* Dkt. No. 14-2 at ¶ 17. Plaintiffs rebut this allegation in their response by stating that the bid was not rejected by Chobani, but rather that Chobani wished to make "continual alterations to the plan for the packaging building." *See* Dkt. No. 15-1 at ¶ 17. Ultimately, the parties do agree that Brenton was unable to successfully obtain a purchase order from Chobani in the Fall of 2011. *See* Dkt. No. 14-2 at ¶ 18.

Defendants contend that after Chobani's "rejection" of the August 15, 2011 bid, Plaintiffs'

---

[2] The August 15, 2011 big identifies the bid as being "preliminary" because, as the terms of the bid state, "we know the system design is evolving due to the fast track nature of the project." *See* Dkt. No. 14-5 at 24.

involvement in the preparation of a subsequent bid to Chobani terminated. *See id.* at ¶ 19.

However, Plaintiffs dispute this alleged fact, and posit instead that Nickel, as the owner of

Kinematic, remained involved in the subsequent bid that Brenton submitted to Chobani in early

February, 2012. *See* Dkt. No. 15-1 at ¶ 19. Not only do the parties disagree on the similarities

that did or did not exist between the two bids that were submitted by Brenton to Chobani,[3] but

Defendants argue that the only reason for Nickel's continued involvement with Chobani was for

the purpose of hiring a subcontractor for the installation and wiring component of the job.[4] *See*

Dkt. No. 14-2 at ¶ 21. Kinematic submitted a bid on behalf of the subcontractor AEI for the

installation and wiring work for the Chobani project and Kinematic was paid a commission by

AEI. *See* Dkt. No. 14-2 at ¶ 22. Plaintiffs contend that the only reason for the interaction and

business between Kinematic and the subcontractor AEI was due to the direction by Brenton. *See*

Dkt. No. 15-1 at ¶ 22.

In early March, 2012, after negotiations between Brenton's president, Barry Heiser, and

Marc Abjean of Chobani, an interim purchase order was submitted to Brenton by Chobani. *See*

Dkt. No. 14-2 at ¶ 23; *see also* Dkt. No. 15-9. However, shortly thereafter, on March 22, 2012,

Chobani placed the project on hold to allow for additional scope changes. *See* Dkt. No. 14-2 at ¶

24; *see also* Dkt. No. 14-5. Plaintiffs contend that the various changes to the project by Chobani

reflect the fact that this was an evolving project and was not simply based off of one singular bid.

---

[3] Defendants contend that the second bid that was submitted to Chobani in early 2012 "focused heavily on Shuttleworth conveyors instead of the palletizing cells that were the focus of the 2011 bids to Chobani." *See* Dkt. No. 14-2 at ¶ 20. However, Plaintiffs argue that this statement is untrue, that the Shuttleworth conveyors had been a requirement of Chobani since November and that a form of palletizing systems were factored into the quote. *See* Dkt. No. 15-1 at ¶ 20.

[4] The price for the installation and wiring work of the subcontractor was to be included in the second bid that Brenton submitted to Chobani. *See* Dkt. No. 15-1 at ¶ 21.

*See* Dkt. No. 15-1 at ¶ 25. However, Plaintiffs contend that assuming Defendants argument that the Chobani project was dictated by change orders, Defendants had paid Plaintiffs for change orders in past projects and this project was no different. *See id.* at ¶ 26.

According to Plaintiffs, on June 24, 2012, in a telephone call made to Peter Nickel from Brenton's Troy Snader, Nickel was presented with a $100,000 settlement for the work Brenton believed Kinematic contributed to the Chobani project. *See id.* at ¶ 28; *see also* Dkt. No. 14-4 at 167-68. Defendants contend in their statement of material facts that Nickels was told that he was only going to be offered $100,000 as a finders fee for the Chobani project and that he would not be paid a commission because "Kinematic did not sell the work purchased by Chobani." *See* Dkt. No. 14-2 at ¶ 28; *see also* Dkt. No. 15-1 at ¶ 28. Subsequently, in January, 2013, Kinematic accepted a $25,000 check made out to it by Brenton. *See* Dkt. No. 15-1 at ¶ 30. Plaintiffs contend that they accepted this payment as part of the commission due from the Chobani project; however, Defendant's contend that this payment was made to Plaintiffs as part of the $100,000 finders fee, and that Plaintiffs refused to accept the final $75,000 of the payment. *See* Dkt. No. 15-1 at ¶ 30; *see also* Dkt. No. 14-2 at ¶ 30. Plaintiffs continue to hold the $25,000 payment in their attorney's escrow account. *See* Dkt. No. 15-1 at ¶ 30.

### III. DISCUSSION

**A.     Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the

court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.      Breach of Written Contract**

Under New York law, a plaintiff alleging a breach of contract claim must allege the following elements: (i) the existence of a contract; (ii) adequate performance of the contract by the plaintiff; (iii) breach by the other party; and (iv) damages suffered as a result of the breach. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citation omitted); *see also Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 357-58 (S.D.N.Y. 2001) (citation omitted). "In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff*, 171 F. Supp. 2d at 358 (citation omitted).

"When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (2d Dep't 2011) (citations omitted). "In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985)). "When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." *Id.* (citations omitted). "Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate . . . since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Id.*

The Second Circuit has "defined ambiguous language as that which is '"capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."'" *Id.* (quotations omitted). "Conversely, language is not ambiguous when it has '"a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion."'" *Id.* (quotations omitted). "Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties' intended a meaning different than that expressed in the

agreement and, therefore, extrinsic evidence 'may be considered only if the agreement is ambiguous.'" *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) (quotation and other citations omitted).

In the present case, it is undisputed by the parties that there was a written contract between Plaintiff Kinematic and Defendant Brenton, which was entered into on January 18, 2008, and was to last for a term of one year. *See* Dkt. No. 14-2 at ¶ 5. However, Plaintiffs contend that after the January 2009 expiration of the written contract, the parties continued to conduct business in a similar manner and according to the terms of the Agreement. *See* Dkt. No. 15-2 at 2. Due to the fact that the written agreement between the parties had expired in January 2009, the issues in this case do not center around a breach of a written or express contract. Rather, the Court must determined, based on the conduct of the parties, whether the terms of the written contract were continued into an oral or implied in fact agreement that carried the same terms as the 2008 written agreement.

## C.    Breach of Implied Contract

"Under New York Law, 'a contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the "presumed" intention of the parties as indicated by their conduct.'" *Leibowitz v. Cornell University*, 584 F.3d 487, 506–07 (2d Cir. 2009) (quoting *Jemzura v. Jemzura*, 36 N.Y.2d 496, 503–04 (1975)). An implied contract can have the same binding authority as an express contract, so long as the implied contract satisfies the required "'elements [of] consideration, mutual assent, legal capacity and legal subject matter.'" *Id.* at 507 (quoting *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 94 (1999)); *Brown v. St. Paul Travelers Co., Inc.*, 331 Fed. Appx. 68, 70 (2d Cir. 2009) (holding

that an implied contract "'is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct'") (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006)). "Under New York Law, 'the parties' conduct after the expiration of [a] written contract, including [one party's] continued rendition of services, [the other's] acceptance of those services and . . . payment . . . in accordance with the terms of the written contract' can establish 'a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract.'" *Andrews v. Sotheby Intern. Realty, Inc.*, No. 12 Civ. 8824, 2014 WL 626968, *8 (S.D.N.Y. Feb. 18, 2014) (quoting *Watts v. Columbia Artists Mgmt. Inc.*, 188 A.D.2d 799, 591 N.Y.S.2d 234, 236 (3rd Dep't 1992)) (other citation omitted); *see also Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir. 1946) ("When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old").

In the present case, one of the main issues presented to the Court is whether a contract implied in fact existed between the parties after the expiration of their written contract on January 18, 2009. After the expiration of the written Agreement, both parties admit that Plaintiff Kinematic continued to act as Defendant Brenton's representative in a similar fashion regarding the services Kinematic had provided to Brenton under their original written Agreement. *See* Dkt. No. 14-2 at ¶ 11; *see also* Dkt. No. 15-1 at ¶ 11. Although the commission schedule may have differed between sales made under the January 2008 Agreement, and those that occurred after its expiration in terms of the particular percentages Brenton owed to Kinematic for specific pieces of equipment that were sold, the services that Kinematic provided to Brenton were substantively similar. *See* Dkt. No. 14-2 at ¶ 11; Dkt. No. 15-1 at ¶ 11. However, the parties dispute the level

of Plaintiffs' involvement with the Chobani Project and whether the parties' actions constituted an extension of the implied contract, the successful bid of which was submitted on February 8, 2012, and which was eventually completed in December of 2012. *See* Dkt. No. 15-1 at ¶ 19.

In viewing the facts in dispute in Plaintiffs' favor as the non-moving party, the Court finds that, based on Kinematics' continued involvement in the negotiations that occurred between Brenton and Chobani and the evolution of the bids that were submitted to Chobani by Brenton, it was reasonable for Kinematic and Kinematics' owner Peter Nickel to believe that this job with Chobani was no different than the other jobs where Kinematic acted as Brenton's representative. The parties agree that Peter Nickel was present at the meeting on February 2, 2012, when officials from both Brenton and Chobani discussed what services and equipment would be required to be included in the February 8, 2012 firm quote. *See* Dkt. No. 14-2 at ¶ 21. The capacity in which Nickel appeared at the meeting under – whether it be as the representative of Brenton, or solely in order to bid on the installation and wiring component that was to be submitted in Brenton's bid to Chobani – is in dispute. *See id.*; *see also* Dkt. No. 15-1 at ¶ 21. In its response to Defendants' statement of material facts, Plaintiffs contend that Kinematic was "fully involved in Brenton's efforts at obtaining a Chobani order," and "[i]t was at the request of Brenton that he work with local subcontractors so that Brenton could obtain estimates to use in Brenton proposals." *See* Dkt. No. 15-1 at ¶ 21.

There is some indication in the communications that continued between Brenton officials and Peter Nickel that Brenton appeared to be shying away from allowing Nickel to be so heavily involved in the February 8, 2012 bid to Chobani as compared to his involvement in the bids that were submitted in August, 2011, and November, 2011. However, absent from the record is any express communication made to Kinematic by Brenton that Brenton had any intention of not

paying a commission to Kinematic for its involvement in the Chobani Project until June, 2012, after Brenton had received the purchase order from Chobani. According to Peter Nickel's deposition testimony, he first learned that there was a dispute between himself and Brenton on June 24, 2012. *See* Dkt. No. 14-4 at 168. On that date, Troy Snader of Brenton called Nickel and informed him that Brenton had decided to offer him $25,000 now and $75,000 for his work. *See* Dkt. No. 14-4 at 167-69. In his deposition, Nickel indicated that he was insulted by the offer, which was even less than the 2.5% that is typically paid as a finder's fee in the industry. *See id.* Nickel testified that a finder's fee as opposed to a commission is typically paid when "all [he does] is give the manufacturer the name and contact of the customer and go away, stop working on it." *Id.* at 169.

Moreover, Plaintiffs provided emails from Peter Nickel/Kinematic and Brenton employees throughout this entire time period. When viewed in Plaintiffs favor, these emails demonstrate that Plaintiffs were clearly involved throughout the entire process with the Chobani Project. *See* Dkt. No. 15-4

Further, Dan Johnson, a former manager of a Brenton acquired company, claims that Nickel introduced Brenton to the Chobani Project in the spring of 2011. *See* Dkt. No. 15-6 at ¶ 19. Mr. Johnson and Nickel were present at Brenton's initial introduction to the people from Chobani. *See id.* at ¶ 21. Mr. Johnson further indicated that he "and members of the Application Engineering group made joint visits with Peter Nickel to refine the design of the system so our proposal would meet the customer's needs and desires." *See id.* at ¶ 22. Further, according to Mr. Johnson, in November of 2011, he participated in a presentation to Chobani along with Peter Nickel, Troy Snader (Brenton), John Naunas (Shuttleworth) and Rob Robinson (Brenton). *See id.* at ¶ 25. Although Defendants contend otherwise, Mr. Johnson contends that Nickel and

Kinematic continued to act as Brenton's representative after the expiration of the written agreement. *See id.* at ¶ 14; *Watts v. Columbia Artists Mgmt. Inc.*, 188 A.D.2d 799, 801 (3rd Dep't 1992) ("We are of the view that the parties' conduct after the expiration of the written contract, including defendant's continued rendition of services, plaintiff's acceptance of those services and plaintiff's payment of commissions in accordance with the terms of the written contract, clearly establish a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract between defendant and the Corporation") (citations omitted).

The facts in dispute in the present matter preclude the Court from granting Defendants' motion for summary judgment on this ground. Although the parties agree that Nickel continued to provide services for Brenton upon expiration of the written contract, the extent of those services is in dispute, as is when the services actually terminated. *See Andrews*, 2014 WL 626968, at *8 (quoting *Watts v. Columbia Artists Mgmt. Inc.*, 188 A.D.2d 799, 591 N.Y.S.2d 234, 236 (3rd Dep't 1992)). Accordingly, Defendants' motion for summary judgment is denied as to this claim.

D.     **Statute of Frauds**

   *1. Performance within one year*

Defendants contend that the alleged oral contract is barred by the statute of frauds because, "[a]s the evidence demonstrates in this action, the alleged performance of the parties began in June, 2011 when Kinematic first forwarded the Chobani request for proposal to Brenton and continued well beyond June, 2012, by which point installation of Brenton's product had not even begun." Dkt. No. 14-1 at 14.

Under New York General Obligations Law § 5–701, the statute of frauds provides:

> Every agreement, promise, or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> > 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . . .

N.Y. Gen. Oblig. Law § 5-701(a)(1).

"The Statute of Frauds 'only applies to agreements which are, by express stipulation, not to be performed within a year. It does not apply to an agreement which appears by its terms to be capable of performance within the year; nor to cases in which the performance of the agreement depends upon a contingency which may or may not happen within the year.'" *Levine v. Zadro Prods.*, No. 02 CIV. 2838, 2003 WL 21344550, *3 (S.D.N.Y. June 9, 2003) (quoting *Dresser v. Dresser*, 35 Barb. 573, 577 (N.Y. Gen. Term 1862)). "Thus, 'if the obligation of the contract is not, by its very terms or necessary construction, to endure for a longer period than a year, it is a valid agreement, although it may be capable of an infinite continuance.'" *Id.* (quotation omitted). "New York courts generally construe the statute of frauds narrowly, voiding only those oral contracts 'which by their very terms have absolutely no possibility in fact and law of full performance within one year.'" *Kroshnyi v. U.S. Pack Courier Servs.*, 2014 U.S. App. LEXIS 21058, *44 (2d Cir. 2014) (quoting *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 454 (2d Cir. 1984)). Thus, "'wherever an agreement has been found to be susceptible of fulfillment within that time, in whatever manner and however impractical, [courts have] held the one-year provision of the Statute to be inapplicable, a writing unnecessary, and the agreement not barred.'" *See Kroshnyi c. U.S. Pack Courier Servs.*, Nos. 11-2789-cv, 11-4368-cv, 2014 U.S. App. LEXIS 21085, at *44 (quoting *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d at 455).

In the present matter, the business relationship that existed between Brenton and Chobani

for the expansion of Chobani's upstate New York plant expanded to more than a year and a half period. *See* Dkt. No. 14-2 at ¶¶ 13, 29. The reason the project took as long as it did was due to the customer's (Chobani) evolving needs, which increased the scope of the project. This evolution occurred as the result of the changing needs of the customer and the continued negotiations as to what equipment and the quantity of equipment would be necessary for the expansion. *See* Dkt. No. 15-1 at ¶ 17. In fact, the last firm quote that was submitted to Chobani by Brenton, #32229-11 dated April 26, 2012, which is based on firm quote #32229-056, dated February 8, 2012, is expressly based on meetings with Chobani that occurred on February 2, 2012 and February 3, 2012, which Peter Nickel was in attendance for. *See* Dkt. No. 14-5 at 82.

In *Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV*, 754 F. Supp. 2d 610 (S.D.N.Y. 2010), the plaintiff had a commission agreement with the defendant, in which the plaintiff was to act as the defendant's sales agent for business conducted with a specific client. *See id.* at 614. The agreement between the parties was terminable "at will, by any party, at any time[.]" *Id.* Rejecting the defendant's statute of frauds argument, the court held "the event regulating the termination of the contract – that is, the termination of the agency relationship and subsequent liability to pay commissions – could have taken place within a year, and therefore section 5-701(a)(1) of the statute of frauds does not apply." *Id.* (citation omitted).

In *Levine*, the plaintiff had a commission agreement with the defendants. *See Levine*, 2003 WL 21344550, at *3-*4. Although the defendants could terminate the agreement with the plaintiff at any time, it was still obligated to pay commissions to the plaintiff so long as they continued to accept orders from clients previously procured by the plaintiff. *See id.* at *4. Since no action by the parties could terminate the existing contractual liability to pay the plaintiff commissions, the court found that the agreement for post-termination commission payments

could not be performed with one year and was therefore barred by the statute of frauds. *See id.* at *5 (citations omitted).

In the present matter, the Agreement contains the following provision:

> The parties hereto agree that the terms of this Agreement shall run for one (1) year from the date of execution by both parties. This agreement is cancelable by either party with 30 days written notice. CP will be compensated per the terms of this agreement on all active (recorded activity within the 6 month period prior to effective date of termination) projects quoted if closed within 6 months after termination becomes effective.

Dkt. No. 15-4 at 7. The Agreement also provides that "any lead or sales pursuit that has had no activity in a 6-month period becomes the property of Brenton and becomes a dire t sale." *Id.* at 10. This language, unlike the provision at issue in *Levine*, does not contemplate the perpetual payment of commissions so long as the client continues to orders products supplied by Defendant. Rather, the Agreement here entitles Plaintiff only to commissions after his termination if the quoted project is closed within six (6) months of his termination. Clearly, such an agreement is one that could be completed within one year and, therefore, it is not prohibited by the statute of frauds.

Additionally, to the extent Defendants are attempting to argue that the contract is void because the amount of any commission could not be determined until the Chobani Project was actually completed and paid for by Chobani, which would be beyond one year, the argument is unavailing. In *Gold v. Benefit Plan Adm'rs, Inc.*, 233 A.D.2d 421 (2d Dep't 1996), the defendant argued that the agreement regarding commissions to be paid to the plaintiff violated the statute of frauds because the full amount of the commission, which fluctuated monthly based on the number of employees enrolled in the plan, could not be calculated until the end of the customer's one-year contract term." *Id.* at 421. Denying the defendant's motion, the court held that "[e]ven though the

amount of the commissions due could not be determined until some future time, '[s]uch future satisfaction of a pre-existing liability involves the matter of computation only and is merely mechanical in its application.'" *Id.* (quotation and other citation omitted). In the present matter, as in *Gold*, the event arguably triggering Defendants' liability to pay a commission did occur within one year. In early May of 2012, in an email exchange between Rob Robinson, Troy Snader and Peter Nickel, it was confirmed that Chobani had paid the down payment on the project to Brenton. *See* Dkt. No. 15-4 at 90.

Based on the foregoing, the Court finds that the statute of frauds does not preclude Plaintiffs' claim; and, therefore, the Court denies Defendants' motion for summary judgment on this ground.

### 2. Compensation for Negotiation

Defendants contend that, pursuant to section 5-701(a)(10) of the General Obligations Law, the alleged oral contract is void because a contract to "pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein" is void unless is writing. *See* Dkt. No. 14-1 at 14. Defendants argue that, "[w]here, as in this case, an 'intermediary's activity is so evidently that of providing "know-how" or "know-who" in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise' that activity qualifies as 'business opportunity' for purposes of applying the statute.'" *Id.* (quoting *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 267 (N.Y. 1977)).

Section 5-701(a)(10) of the General Obligations Law provides that a contract is void,

unless it is in writing, if it

> [i]s a contract to pay compensation for services rendered in
> negotiating a loan, or in negotiating the purchase, sale, exchange,
> renting or leasing of any real estate or interest therein, or of a
> business opportunity, business, its good will, inventory, fixtures or
> an interest therein, including a majority of the voting stock interest
> in a corporation and including the creating of a partnership interest.
> "Negotiating" includes procuring an introduction to a party to the
> transaction or assisting in the negotiation or consummation of the
> transaction. This provision shall apply to a contract implied in fact
> or in law to pay reasonable compensation but shall not apply to a
> contract to pay compensation to an auctioneer, an attorney at law,
> or a duly licensed real estate broker or real estate salesman.

N.Y. Gen. Oblig. Law § 5-701(a)(10).

"It is well established that the statutorily required writing need not be contained in one single document, but rather may be furnished by 'piecing together other, related writings.'" *William J. Jenack Estate Appraisers & Auctioneers, Inc. v. Rabizadeh*, 22 N.Y.3d 470, 477 (2013) (quotation and other citation omitted). Therefore, in determining whether there is compliance with General Obligations Law § 5-701, a court may look to documents relevant to the negotiation and sale of a business opportunity. *See id.* "Further, while General Obligations Law § 5–701(a)(10) applies to contracts implied in law to pay reasonable compensation . . . , in an action to recover reasonable compensation, 'a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged services.'" *Truforge Global Machinery Corp. v. Viraj Group*, 84 A.D.3d 938, 939 (2d Dep't 2011) (internal citation and quotation omitted). "'The obligation of the defendant to pay reasonable compensation for the services is then implied.'" *Id.* (quoting *Morris Cohon & Co. v. Russell*, 23 N.Y.2d at 575-576, 297 N.Y.S.2d 947, 245 N.E.2d 712).

In the present matter, the Court finds that the contract, along with the bids submitted to Chobani and the emails between the parties are sufficiently definite to satisfy the statute of frauds

writing requirement. In the Preliminary Firm Quote dated August 15, 2011, the cover page indicates that it was prepared by Brenton, but it lists Peter Nickel of Kinematic Technologies as its representative. *See* Dkt. No. 15-4 at 52. Further, the "New Request for Quote Form" dated June 15, 2011, lists the customer as "Agro Farma, Inc." (Chobani), and the "Lead Generated By" as "Kinematic Technologies, Inc." *Id.* at 50. Thereafter, in Budget Quote #32229-01 dated November 10, 2011, which was submitted and prepared by Brenton to Agro Farma, Inc., Brenton again identified Peter Nickel of Kinematic Technologies as their representative. *See id.* at 73. Additionally, in the meeting minutes/agenda prepared by Agro Farma dated March 16, 2012, Agro Farma listed Peter Nickel as being the "Local Representative Brenton/Pro-Mach," as well as being associated with Kinematic. *See id.* at 78-79. Further, Plaintiffs included a multitude of emails Nickel sent to various people involved with the Chobani Project. *See, e.g.,* Dkt. No. 14-5 at 65-73, 101-140. These emails summarize the progress of the project, discuss the relevant roles of those involved, discuss plans going forward, and detail the changes made as the project progressed. *See id.* This correspondence, along with the contract and bids submitted by Brenton with Kinematic/Nickel listed as a representative and contact, are sufficient to satisfy the writing requirement of the statute of frauds. *See Trueforge Global Machinery Corp.*, 84 A.D.3d at 939 (denying the defendants' statute of frauds defense and finding that "certain e-mail correspondence . . . was sufficient to set forth an objective standard for determining the compensation to be paid to the plaintiff as a finder's fee, since it was tied to an extrinsic event, i.e., it was expressed as a percentage of the price paid by the defendants for the located acquisition opportunity, thus rendering the terms definite and enforceable") (internal and other citations omitted); *Kausal v. Educational Products Information Exchange Institute*, 105 A.D.3d 909, 911 (2d Dep't 2013) (citation omitted); *Shapira v. Dictaphone*, 66 A.D.2d 882, 884 -85 (2d Dep't 1978) (finding that

the statute of frauds writing requirement satisfied where, "on two occasions early in his dealings with Dictaphone, clearly indicated in writing that he expected to be paid for his services as a broker-finder, that Dictaphone extracted from him the name of the company as well as detailed information about it, that Dictaphone had plaintiff arrange a meeting between the presidents of both corporations and that Tabat, during his acquisition negotiations with Data Documents, kept putting plaintiff off anytime the latter brought up the question of the amount of his fee").

Even if the Court were to find that this provision is otherwise applicable to the present matter, the Court finds that Defendants' motion must nevertheless be denied.  As the Court of Appeals has recognized, "[t]he Statute of Frauds was designed to guard against the peril of perjury; to prevent the enforcement of unfounded fraudulent claims.  But, as Professor Williston observed: 'The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made[.]'" *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 574 (1969) (quoting 4 Williston, Contracts (3d ed.), § 567A, pp. 19-20).  Moreover, the Court of Appeals has also held that "oral agreements that violate the Statute of Frauds are nonetheless enforceable where the party to be charged admits having entered into the contract." *Matisoff v. Dobbi*, 90 N.Y.2d 127, 134 (1997) (citation omitted).

Moreover, Defendants admit that Kinematic submitted bids for projects involving Brenton projects after the expiration of the written contract.  *See* Dkt. No. 14-2 at ¶ 11.  In fact, Kinematic submitted a successful bid after the contracts expiration and was paid a commission pursuant to revised commission schedule.  *See id.*; *see also* Dkt. No. 14-4 at 30-31.  Further, in their statement of material facts, Defendants contend that, "[f]ollowing the expiration of the contract

between Kinematic and Brenton, Kinematic was free to send requests for proposals to Brenton for consideration on a nonexclusive basis." Dkt. No. 14-2 at ¶ 10.

Although a jury may ultimately find in Defendants' favor regarding Plaintiffs' claim, the foregoing facts make clear that the statute of frauds does not foreclose Plaintiffs' breach of contract claim. Accordingly, Defendants' motion for summary judgment on this ground is denied.


**E.      Claims by Plaintiff Peter Nickel**

As Defendants correctly assert, the complaint and undisputed facts clearly demonstrate that Plaintiff Nickel was acting in his capacity as a corporate officer of Plaintiff Kinematic, of which he is the co-owner and only employee. Even the Agreement between the parties is entitled "Kinematic Currie Manufacturer's Representative Channel Partner Agreement." Dkt. No. 15-4 at 3. Accordingly, the Court finds that Plaintiff Peter Nickel should be dismissed as a Plaintiff in this action. *See Gentile v. Conley*, 636 F. Supp. 2d 246, 251 (S.D.N.Y. 2009).

Defendants further assert that the Court should dismiss all claims against Pro Mach Group, Inc. because it was named as a Defendant "solely because of a mistaken impression that it is the parent company of Brenton. Even if true, this fact would be irrelevant in the absence of privity." Dkt. No. 14-1 at 15. Plaintiffs assert that the Court "should not dismiss the claim against Defendant Pro Mach Group, Inc. without allowing substitution of the proper name of a party in interest." Dkt. No. 15-2 at 12. Plaintiffs contend that Defendants have asserted that Brenton is an "'indirect subsidiary' of Pro Mach Group, Inc. They should not be allowed to avoid suit because it isn't the Pro Mach Inc. of whom it is the 'direct subsidiary.'" *Id.*

Having reviewed the parties submissions and the relevant law, the Court finds that Defendant Pro Mach Group, Inc. should be dismissed from this action. The complaint clearly

alleges that the contract at issue was an agreement between Kinematic and Brenton. Pro Mach Group, Inc. was not a party to the Agreement and the undisputed facts indicate that it did not produce any goods relating to Brenton's sale of conveyors and other products to Chobani. *See* Dkt. No. 15-2 at ¶ 2. Additionally, Kinematic provides no support for his argument that the Court should permit it to amend the complaint to substitute in Pro Mach Inc. as a Defendant. To hold Brenton's parent company liable on the alleged breach of contract would necessarily require the Court to pierce the corporate veil. *See Transition Healthcare Associates, Inc. v. Tri-State Health Investors, LLC*, 306 Fed. Appx. 273, 280-81 (6th Cir. 2009); *Ligotti v. Provident Life and Cas. Ins. Co.*, 857 F. Supp. 2d 307, 315 (W.D.N.Y. 2011). Kinematic makes no arguments and presents no evidence that would warrant piercing the corporate veil. *See id.*

Accordingly, the Court denies Kinematic's request to amend the complaint to include Pro Mach, Inc. as a Defendant. Further, Pro Mach Group, Inc. is hereby dismissed from this action.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Plaintiff Peter Nickel is **DISMISSED** from this action; and the Court further

**ORDERS** that Defendant Pro Mach Group, Inc. is **DISMISSED** from this action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 11, 2015
       Albany, New York

Mae A. D'Agostino
U.S. District Judge